UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────

JAMES C. MEYERS,                                          **DECISION**
                                                              **and**
                                    Plaintiff,           **ORDER**

           v.
                                                      **01-CV-320F**
JoANNE B. BARNHART, Commissioner of                    **(consent)**
   Social Security Admininstration,

                                    Defendant.[1]

─────────────────────────────────

APPEARANCES:            PAUL M. POCHEPAN, ESQ.
                        Attorney for Plaintiff
                        424 Main Street
                        Suite 622
                        Buffalo, New York 14202

                        KATHLEEN M. MEHLTRETTER
                        Acting United States Attorney
                        Attorney for Defendant
                        JANE B. WOLFE
                        Assistant United States Attorney, of Counsel
                        Federal Centre
                        138 Delaware Avenue
                        Buffalo, New York 14202

## <u>JURISDICTION</u>

     The parties to this action consented to proceed before the undersigned on April

16, 2002.  The matter is presently before the court on motions for judgment on the

pleadings filed by Defendant (Doc. No. 7) on January 28, 2002, and by Plaintiff (Doc.

No. 9) on March 26, 2002.

─────────────────────

     [1] On November 9, 2001, JoAnne B. Barnhart became Commissioner of Social Security and, pursuant to Fed.R.Civ.P. 25 (d), is substituted for her predecessor, Larry G. Massanari, as the defendant in this action.  No further action is required to continue this suit.  42 U.S.C. § 405(g)("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office").

## BACKGROUND

Plaintiff James C. Meyers ("Plaintiff") seeks review of the Commissioner's decision denying him Social Security Disability Insurance Benefits ("SSDI") under Title II of the Social Security Act ("the Act"), and Supplemental Security Income ("SSI") under Title XVI of the Act (together, "disability benefits").  In denying Plaintiff's application for disability benefits, the Commissioner determined that although Plaintiff has not, since the alleged onset of his disability on December 26, 1996, engaged in substantial gainful activity and suffers from depressive and personality disorders causing some degree of limitation, Plaintiff does not have an impairment or combination of impairments within the Act's definition of impairment.  (R. 19).[2]  The Commissioner also determined that Plaintiff's allegations and associated functional limitations pertaining to his impairment are not fully credible.  (R. 19).  The Commissioner further found that Plaintiff has the residual functional capacity to perform work-related activities at all exertional levels, provided such work did not involve more than minimal dealings with the public or following complex job instructions, and that Plaintiff could perform his past relevant work as a car detailer and a home insulation installer, but not as a pizza delivery person.  (R. 19-20).  As such, Plaintiff was found not disabled, as defined in the Act, at any time through the date of the Commissioner's decision. (R. 20).

## PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits on April 10, 1996, alleging he

---

[2] "R." references are to the page numbers of the administrative record submitted in this case for the court's review.

has been disabled since June 15, 1993.  (R. 56-58).  The application was initially denied on June 14, 1996 (R. 26, 29-33), and upon reconsideration on April 1, 1997.  (R. 27-28, 38-41).  Pursuant to Plaintiff's request filed June 4, 1997 (R. 42-43), on June 16, 1998, an administrative hearing was held before Administrative Law Judge ("ALJ") Marilyn D. Zahm ("the ALJ"), at which time Plaintiff, represented by Janet McGlone, Esq., appeared and testified.  (R. 593-646).  On August 19, 1998, the ALJ found Plaintiff was not disabled.  (R. 10-24).

On October 20, 1998, Plaintiff requested review of the hearing decision by the Appeals Council.  (R. 9).  Upon considering Plaintiff's request for review of the ALJ's hearing decision and the record, the Appeals Council, on March 23, 2001, found no basis for granting the review and denied the request, thereby rendering the ALJ's hearing decision the final decision of the Commissioner.  (R. 6-7).  This action followed on May 3, 2001.

The Commissioner's answer to the Complaint, filed on August 6, 2001 (Doc. No. 5), was accompanied by the attached record of the administrative proceedings.  On January 28, 2002, the Commissioner filed a motion for judgment on the pleadings and a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings (Doc. No. 8) ("Commissioner's Memorandum").  On March 26, 2002, Plaintiff cross-moved for judgment on the pleadings, supported by the attached Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings (Doc. No. 9).  Oral argument was deemed unnecessary.

Based on the following, Defendant's motion for judgment on the pleadings (Doc. No. 7) is GRANTED; Plaintiff's cross-motion for judgment on the pleadings (Doc. No. 9)

is DENIED.

## FACTS[3]

Plaintiff,  James C. Meyers ("Plaintiff"), was born on February 26, 1949, dropped out of high school after completing the ninth grade, but later received a general equivalency diploma.  (R. 599, 601).  Plaintiff entered the Marines, but a few months later received a medical discharge related to a physical deviation of one eye affecting his depth perception.  (R. 125, 128).  Plaintiff claims he is unable to work because of severe depression and back pain, and initially alleged a disability onset date of June 1993, but, at the administrative hearing, amended the alleged disability onset date to December 26, 1996.

Plaintiff's medical history establishes that Plaintiff has been diagnosed with a variety of mental illnesses since 1968, at which time Plaintiff lived with his mother, stepfather, siblings and half-siblings in Dunkirk, New York.  (R. 127).  Plaintiff's biological father, whom Plaintiff's mother divorced when Plaintiff was eleven years old, was an alcoholic who often abused Plaintiff.  (R. 127).  Plaintiff was never close to either his biological father or his stepfather.  (R. 127).

Between August 18, 1968 and April 27, 1970, Plaintiff was admitted on four separate occasions to Gowanda State Hospital ("Gowanda"), in Gowanda, New York, for psychiatric treatment.  (R. 123-42).  Specifically, on August 19, 1968, Plaintiff, following a suicide attempt the day before, was diagnosed with simple adult maladjustment.  (R. 123-26).  On February 27, 1969, upon being readmitted to

---

[3] Taken from the pleadings, administrative record and motion papers filed in this action.

Gowanda, Plaintiff was diagnosed with chronic schizophrenia.  (R. 131).  On June 19,

1969, in another readmission to Gowanda, Plaintiff, following an argument with his wife

and cutting his left wrist, was brought by the police to Gowanda where he was

diagnosed with social maladjustment without manifest psychiatric disorder.  (R. 134-35).

On January 28, 1970, Plaintiff, again readmitted to Gowanda, was diagnosed with

schizoid personality and sociopathic personality.  (R. 136-38).  Plaintiff, who remained

in Gowanda following his January 28, 1970 readmission, was diagnosed on March 17,

1970 with a passive aggressive personality disorder, which was improved, and it was

noted that Plaintiff was "employable but should not operate a motor vehicle at this time."

(R. 139-41).  Plaintiff remained at Gowanda until April 27, 1970, but did not return.  (R.

142).

        As of July On July 13, 1976, Plaintiff had been married for seven years, had two

children, and was in the process of separating from his wife whom Plaintiff had recently

discovered was having an affair.  (R. 144).  Since separating from his wife two months

earlier, Plaintiff had been living with his mother and stepfather in Norwich, Connecticut,

where he was admitted to Norwich Hospital ("Norwich Hospital") on three occasions for

psychiatric episodes.  (R. 143-49).  In particular, on July 13, 1976, Plaintiff was admitted

to Norwich Hospital following a botched suicide attempt in which Plaintiff shot himself in

the left leg.  (R. 146-47).  Plaintiff's history of alcohol abuse, marijuana abuse and use

of tetrahydrocannabinol[4] ("THC") was noted, and Plaintiff was diagnosed with

---

        [4] Cannabis, one of the oldest hallucinogenic drugs known, contains approximately 60 photoactive
chemicals called "cannabinoids," the most important one of which is "THC" or "tetrahydrocannabinol."
Tetrahydrocannobinol - THC, *available at* www.ch.ic.ac.uk/vchemlib/mim/bristol/thc/thc_text.htm.

personality disorder, antisocial personality, alcoholism, episodic excessive drinking, drug dependence, cannabis sativa (hashish, marijuana).  (R. 146).  When Plaintiff was discharged from Norwich Hospital on August 9, 1976, his condition was improved, his prognosis was guarded and he was advised to continue further psychiatric treatment. (R. 144-45).  Plaintiff was readmitted to Norwich Hospital on November 7, 1978, after he was found in a burning automobile with self-inflicted lacerations on his lower leg and incoherent.  (R. 148-49).  Plaintiff denied suicidal ideation, explaining his actions were an attempt to manipulate his wife, who was planning to move to Florida with their two children, ages 7 and 5.  (R. 148).  Plaintiff was diagnosed with depressive neurosis, social maladjustments without manifest psychiatric disorder, marital maladjustment, and drug dependence, cannabis sativa (hashish, marijuana).  (R. 148).  Plaintiff reported heavy alcohol and drug abuse, including marijuana, THC, mescaline, quaaludes, angel dust, LSD and heroin.  (R. 148).  Plaintiff, who demonstrated good motivation to continue psychiatric treatment on an outpatient basis and was eager to work, was discharged on November 8, 1978.  (R. 149).

Plaintiff was next hospitalized from October 9 to 19, 1982 in Northeast Vermont Reg. Hospital for alcohol withdrawal.  (R. 150-72).  Plaintiff's discharge summary states Plaintiff is "a depressed person with a history of multiple suicidal gestures."  (R. 152). Plaintiff reported drinking daily, denied binge drinking, and admitted abusing numerous drugs, including Darvon (narcotic opioid analgesic), Dalmane (insomnia relief), Percodan (opiate analgesic), pot, LSD, angel dust, cocaine and cough syrup.  (R. 157). Plaintiff also reported marital and legal troubles and an inability to hold steady employment, all which he attributed to his drug and alcohol abuse.  (R. 154-57).

Plaintiff's diagnosis upon discharge included chronic alcoholism, personality disorder, multiple self mutilations, recent superficial lacerations of the forearms, family history of diabetes mellitus, and status post herniorrhaphy (hernia repair).  (R. 152).

On June 19, 1993, Plaintiff was admitted to Lawrence and Memorial Hospital in New London, Connecticut where he was diagnosed with chest pains of uncertain etiology and esophageal erosions.  (R. 179-89).  Plaintiff underwent numerous diagnostic test, and all clinical laboratory findings were negative and acute myocardial infarction was ruled out.  (R. 179-89). Plaintiff was discharged on January 23, 1993 with prescriptions for nitroglycerin for chest pain, prilosec for heartburn and carafate for duodenal ulcer.  (R. 181).

On July 22, 1994, Plaintiff was admitted to Sheehan Memorial Hospital ("Sheehan Memorial") in Buffalo, New York, for detoxification and rehabilitation with a past medical history of chemical and alcohol dependency and myocardial infarction. (R. 190-208).  Plaintiff was diagnosed with diacetylmorphine (highly addictive morphine derivative, usually injected) and cocaine dependency, alcohol dependency, knee pain, angina and hematuria (presence of red blood cells in urine).  (R. 193).  Plaintiff was discharged on August 1, 1994 in improved condition with guarded diagnosis.  (R. 193).

On October 16, 1994, Plaintiff was admitted to Brooks Memorial Hospital ("Brooks Memorial"), in Dunkirk, New York, with complaints of pain in his upper-mid anterior chest, radiating into his left arm and the left side of his neck, and back pain, and which was not relieved by nitroglycerine.  (R. 268-69).  Plaintiff reported he was disabled by a back problem.  (R. 269).  Upon admission, Plaintiff had shortness of breath, and general weakness with radiation of pain to the left arm and neck.  (R. 269).

Plaintiff's medications included Darvocet-N, Augmentin and Nitroglycerine, Plaintiff reported an allergy to Talwin, and that he smoke one-half pack of cigarettes a day, but did not drink.  (R. 270).  A chest X-ray was negative with no evidence of any active disease.  (R. 276).  Upon examining Plaintiff, it was the impression of Youngman M. Kim, M.D. ("Dr. Kim"), that Plaintiff had chest pain, but ruled out angina, hypercholesterolemia, back strain with walking difficulty, and status left inguinal hernia repair and kidney stone removal, multiple hand surgeries from nerve injury sustained in a car accident, and gunshot wound surgery to his left leg.  (R. 272).  Dr. Kim further reported Plaintiff did not "look very sick."  (R. 272).

Plaintiff, on January 5, 1995, went to Brooks Memorial's emergency room seeking treatment for a "mild Darvon overdose," explaining that he had been prescribed Darvon for low back pain, took 20 - 30 pills of Darvon that day for severe pain, had a "couple of beers," and was not feeling very well.  (R. 263).  Plaintiff stated he felt better, went outside to smoke, and did not return.  (R. 264).

On January 29, 1995, Plaintiff sought treatment at Brooks Memorial's emergency room for left shoulder pain.  (R. 256-62).  An X-ray of Plaintiff's left shoulder revealed no osseous, articular or soft tissue abnormality.  (R. 260).  Plaintiff was prescribed Tylenol # 3 with codeine, advised to rest his shoulder in a sling, apply hot or cold compresses as needed and follow up with Dr. Gopolar in a few days if not better.  (R. 256-59).

Plaintiff went to Brooks Memorial's emergency room on January 31, 1995 complaining he had shoulder pain over the past four to five days which was not relieved by Motrin, and requested Tylenol # 3 with codeine.  (R. 251).  It was noted the Plaintiff

has a history of drug seeking behavior.  (R. 251).  According to treatment notes, Dr. Majeed explained that Plaintiff's shoulder needed to be immobilized and that Plaintiff would be prescribed only NSAID (non-steroidal anti-inflammatory drugs").  (R. 252). Plaintiff became increasingly upset, stated that other doctors had given him Tylenol # 3 with codeine and, thus, Dr. Majeed should do likewise.  (R. 252).  When Dr. Majeed refused, Plaintiff continued to argue, then left the emergency room for the administrative block where Plaintiff spoke to a social worker and explained his multiple visits and attitude.  (R. 252).  Plaintiff did not return to the emergency room that day.

On February 16, 1995, Plaintiff was examined in Brooks Memorial's emergency room regarding Plaintiff's complaints of pain and swelling in his wrists and hands.  (R. 246-50).  X-rays showed Plaintiff's wrists were intact and without fracture or dislocation. (R. 250).  Plaintiff was given Indocin (nonsteroidal anti-inflammatory pain medication), and discharged.  (R. 246-47).

On March 2, 1995, Plaintiff was treated in Brooks Memorial's emergency room for an overdose of Darvon.  (R. 232-41).  Plaintiff reported he usually took 20 Darvon pills a day, but had lost count and took six more which made him "extremely anxious" and unable to sit still.  (R. 232).  Plaintiff was monitored in the emergency room for several hours, and released later that day.  (R. 232-33).

Plaintiff was treated in Brooks Memorial's emergency room on March 4, 1995 for pain in his left wrist, hand and hip, and tingling fingers aggravated by movement.  (R. 241-43).  An X-ray of Plaintiff's left hand and wrist was negative with no radiographic evidence of underlying rheumatoid arthritis.  (R. 243).  Plaintiff was prescribed Sulindac (treatment for rheumatoid arthritis pain and inflammation) and advised to use an ace

9

bandage.  (R. 242).

On April 29, 1995, Plaintiff was treated in Brooks Memorial's emergency room for a laceration of his right index finger.   (R. 244-45).  The wound was sutured closed and Plaintiff was advised to keep it clean.  (R. 245).

Plaintiff was treated in Brooks Memorial's emergency room on May 21, 1995 for right groin and left knee pain.  (R.229-30).  An X-ray of Plaintiff's left knee was normal, Plaintiff was given Toradol (nonsteroidal anti-inflammatory analgesic) for pain, advised to apply ice compresses and was discharged the same day.  (R. 229).

On June 20, 1995, Plaintiff, complaining of chest pain, was taken by ambulance to the emergency room at Brooks Memorial.  (R. 223).  Upon arrival, Plaintiff was anxious, chest pain and shortness of breath, explained that nitroglycerin had relieved his chest pain earlier that day, but the chest pain recurred, and reported a history of angina and a myocardial infarction three years earlier.  (R. 223).  Chest X-rays showed "no evidence of active disease," and electrocardiogram ("EKG") showed normal sinus rhythm.  (R. 224, 228).  Plaintiff removed his monitor leads, went outside to smoke a cigarette and walked away.  (R. 224).

On June 21, 1995, Plaintiff was admitted to Erie County Medical Center ("ECMC") for detoxification from heroin and Darvon, which Plaintiff stated he had abused for, respectively, 30 and two years.  (R. 374-82).  Plaintiff reported daily use of 10 to 20 Darvon pills and five bags of heroin.  (R. 374).  Plaintiff also reported taking five tablets of Soma compound (muscle relaxant) for 24 years.  (R. 374).  Plaintiff was treated with methadone for heroin dependency and phenobarbital for Soma dependency.  (R. 374).  The methadone and phenobarbital dosages were gradually

decreased until Plaintiff was discharged on July 2, 1995, at which time Plaintiff's detoxification was noted to be "satisfactory."  (R. 374).

On July 7, 1995, Plaintiff was admitted to Niagara Falls Memorial Medical Center ("Niagara Falls Memorial"), in Niagara Falls, New York for heroin detoxification.  (R. 369-70).  Plaintiff was in no acute distress, a physical examination, including chest X-rays and general chemistries, was normal, and he was diagnosed with heroin addiction.  (R. 369-70).  Plaintiff was treated with Darvon in decreasing doses, had an uncomplicated detoxification and was discharged on July 12, 1995 with referral for a 28-day inpatient rehabilitation at Reflections.  (R. 369).

On July 14, 1995, Plaintiff underwent a psychological assessment at Reflections, a substance abuse rehabilitation unit at Lockport Memorial Hospital ("Lockport Memorial"), in Lockport, New York.  (R. 209-13).  Plaintiff reported that he began experimenting with drugs and alcohol at age 15 and between the ages of 16 and 34 consistently drank daily one-half to a full case of beer.  (R. 209).  Plaintiff's use of alcohol was attributed to his increased use of heroin and he no longer believed he had an alcohol problem.  (R. 209).  Plaintiff regularly smoked marijuana between ages 16 and 34, but had not used marijuana in the past year.  (R. 209).  Three years earlier, Plaintiff had a $ 1,000 a day crack cocaine habit.  (R. 209).  Plaintiff began intravenously injecting heroin two years earlier, and presently was using five to six bags a day.  (R. 209).  Plaintiff reported using many different narcotics, amphetamines and barbituates, stating, "you name it, I've used it."  (R. 209).  Plaintiff claimed to have had a cocaine-induced heart attack, undergone 20 detoxifications, completed at least five inpatient rehabilitations since the 1970s, Plaintiff's longest period of sobriety was 105

days in the 1980s following a 90-day detoxification program, and was ambivalent and resistant to 12-step programs, stating he "did not fit in" because he does not have any religious affiliation.  (R. 209-10).  Plaintiff was cooperative, but depressed and negatively judged himself, claimed he was learning disabled, and had problems concentrating and comprehending written material although he could read and write. (R. 210).  Plaintiff had no desire to return to school and claimed he made good money delivering pizza, although he was then unemployed and homeless and stole and borrowed to get money for drugs.  (R. 210).  Plaintiff described himself as a "loner," reported having been arrested at least 15 times, including two larceny charges in the past three months on which Plaintiff was awaiting disposition.  (R. 210).  Plaintiff admitted becoming violent and blacking out when drinking.  (R. 210).  Plaintiff reported he was sexually molested by his biological father at age 8 and had only had chaotic relationships with women.  (R. 211).  Although Plaintiff was relatively healthy, he had leg pains and complained of symptoms related to withdrawal.  (R. 211).  Plaintiff was diagnosed with polysubstance dependence on opiates, alcohol and anxiolytic.  (R. 211).

On August 3, 1995, Plaintiff sought treatment at Brooks Memorial's emergency room for "stabbing" chest pains. (R. 215).  Chest X-rays were negative and EKG was normal, and Plaintiff was restricted from heavy exertion, prescribed aspirin, and a nitroglycerine patch.  (R. 219-22).

On August 28, 1995, Plaintiff was admitted to Buffalo Columbus Hospital in Buffalo, New York, to detoxify from alcohol and heroin.  (R. 299-309).  At that time, Plaintiff, on a daily basis, drank a six-pack of beer and injected five to seven bags of heroin.  (R. 299).  Plaintiff's medical history was significant only for angina.  (R. 304).

Plaintiff's treatment included methadone and lithium in decreasing dosages and, on September 5, 1995, Plaintiff was discharged to Changing Seasons Treatment Center ("Changing Seasons"), in Salamanca, New York, for a 28-day inpatient rehabilitation program.  (R. 299).

Upon entering the inpatient rehabilitation program at Changing Seasons on September 5, 1995, Plaintiff was diagnosed with alcohol and heroin dependence and his treatment plan included "developing motivation toward recovery and abstinence, changing limiting beliefs and coping with triggers."  (R. 345-47).  Treatment progress notes from Plaintiff's first week of treatment indicate Plaintiff was "having a hard time," experienced "powerful cravings," had trouble with "negative peers," and struggled to stay in treatment.  (R. 348-49).  The next week, Plaintiff exhibited increasing signs of depression and hopelessness, and felt overwhelmed and defeated.  (R. 350-51). Plaintiff continued "craving badly" and struggled to remain in the program.  (R. 351). Plaintiff agreed to be evaluated for depression.  (R. 351).  The following week, Plaintiff continued struggling with treatment, was "craving badly," and had difficulty establishing a list of reasons to abstain from drugs and alcohol.  (R. 352-53).  It was noted Plaintiff was "easily agitated," his participation in group therapy varied, and Plaintiff voiced his intention to leave the program.  (R. 352-53).  Plaintiff was further described as "intolerant of others, easily frustrated and agitated," and "struggle[d] to complete work due to lack of concentration."  (R. 353).  Plaintiff was scheduled to be evaluated for depression.  (R. 353).

Plaintiff was evaluated and found to have depression for which he was given

Zoloft (anti-depressant).[5]  (R. 356).  After starting medication, Plaintiff's eye contact was better, he was more conversant and less negative.  (R. 356).

On September 29, 1995, Plaintiff had chest pains and was discharged from Changing Seasons and transported to Olean General Hospital ("Olean"), in Olean, New York, for evaluation, with the intention that Plaintiff be readmitted to Changing Seasons when medically stable.  (R. 344).  Upon arriving at Olean, Plaintiff reported taking nitroglycerin which only partially alleviated his chest pains, but denied shortness of breath, dizziness or palpitations.  (R. 341).  Chest X-ray showed no acute pulmonary or cardiac disease, (R. 339, 342), and an EKG showed sinus bradycardia (normal heart sinus rhythm, but with resting heart rate less than 60 beats per minute).[6]  (R. 340, 342). The examining physician's impression was (1) atypical chest pain, rule out angina, (2) alcohol dependence, and (3) depression.  (R. 342).

Plaintiff returned to Changing Seasons on October 2, 1995, where he was started on Nitroglycerin and Procardia for recurrent chest pain.  (R. 325, 345). Treatment progress notes state Plaintiff continued to exhibit difficulties handling stressful situations, was controlling, impatient and, at time, hostile, and was behind on his treatment plan.  (R. 322).  On October 10, 1995, Plaintiff underwent an angiogram, following which Plaintiff was restricted for three days from heavy lifting, stair claiming and strenuous activities.  (R. 327).

---

[5] Precisely when and by whom Plaintiff was diagnosed with depression is not in the record, although the record strongly suggests the depression diagnosis was made during Plaintiff's participation in Changing Seasons' 28-day inpatient treatment program.  (*See* R. 356 (Changing Seasons' Discharge Summary stating "[t]he patient [Plaintiff] was noted to have depression.  He was placed on medication.  He seemed to improve during his stay.")).

[6] Plaintiff's heart rate was 57 beats per minute.  (R. 340).

Upon his readmission to Changing Seasons, Plaintiff initially was motivated, but was anxious about his after-care plans, impatient and lost his motivation to remain clean of drugs and alcohol.  (R. 323-24).  As of October 17, 1995, Plaintiff was refusing all treatment options presented to him, and was discharged from Changing Seasons. (R. 316-17, 323-24).  Plaintiff's discharge summary prognosis was poor, with Plaintiff demonstrating "ambivalence about remaining abstinent and showed minimum motivation," and also "seem[ed] to be sabotaging his recovery."  (R. 316).  Plaintiff refused to state where he was planning to reside upon his discharge from Changing Seasons, and refused the recommendation to await placement at Horizon Village at First Step Center in Niagara Falls.  (R. 316).  According to the discharge summation, Plaintiff, upon leaving Changing Seasons, voiced his intention to use drugs, blaming changing seasons and his treatment counselor for his situation.  (R. 316). Nevertheless, Plaintiff was 'able to manage his own self care and transportation and is capable of following through on this contract [with Changing Seasons]."  (R. 316).

On October 23, 1995, Plaintiff was admitted to Columbus Hospital for heroin detoxification.  (R. 281-98, 455-58).  Plaintiff's admitting diagnosis was acute drug withdrawal, and his medical history included that Plaintiff was lactose intolerant, had a gunshot wound, hernia, lacerated radial nerve in his thumb, but had no psychiatric illness.  (R. 288).  Plaintiff admitted to substance abuse alcohol and heroin and to smoking one-half pack of cigarettes per day.  (R. 288).  Plaintiff spoke of returning to Vermont to live with his family, including his two children.  (R. 299).  Numerous criminal charges for drug-related arrests were pending against Plaintiff, although the legal matters had been postponed pending Plaintiff's drug treatment.  (R. 291).  Clinical

laboratory tests were performed and were normal except that Plaintiff's urine as positive for opiates.  (R. 281, 293-98).  Plaintiff was treated with methadone in decreasing doses, had an uncomplicated detoxification, and Plaintiff was discharged on October 30, 1995.  (R. 281).

On December 15, 1995, Plaintiff went to Niagara Falls Memorial Medical Center complaining of abdominal pains for the previous month and a half, reporting constipation but denying blood in the stool.  (R. 363-64; *see* R. 361).  An air contrast upper GI series showed enlarged folds of the duodenal cap and loop, possibly reflective of some element of inflammatory disease, a small hiatus hernia only when Plaintiff strained, normal esophagus, and no reflux.  (R. 364).  An air contrast barium enema and abdominal sonogram were normal.  (R. 362, 367).

On February 15, 1996, Plaintiff went to ECMC complaining he had been experiencing, since November 1995, pain in the base of his right thumb without any trauma to the thumb.  (R. 403).  X-rays of the thumb were normal and the attending physician's impression was tenosynovitis (inflammation of tendons and tendon sheath) for which a cortisone injection was given.  (R. 403).  Plaintiff returned to ECMC on March 21, 1996 with the same complaint and was prescribed a splint for his right hand and advised to avoid repetitive motions with his right wrist.  (R. 402-03).

On April 10, 1996, Plaintiff filed his disability benefits application, alleging he became unable to work as of June 15, 1993, because of drug and alcohol dependency, heart problems and a bad back.  (R. 56-58, 67-74).  On a Disability Report completed in connection with the application, Plaintiff stated he was first bothered by his alleged disabling condition on May 20, 1967, that his drug and alcohol abuse caused him to be

16

late for and absent from work, and often caused Plaintiff to quit his job.  (R. 67).

Plaintiff explained he lived in a halfway house where he was "trying to learn how to

become a productive member of society," (R. 67), that he was then receiving treatment

for drug dependency from a "Dr. Reed" of Horizon Village in Sanborn, New York, and

that his current medications included Zoloft (anti-depressant) and Vistaril (for

symptomatic relief of anxiety and tension associated with psychoneurosis).  (R. 68).

Plaintiff listing as his other treating physicians Dr. Gilbert whom he saw weekly for drug

dependency and who had prescribed Darvon for pain, and Dr. Richard Carlson, whom

Plaintiff saw monthly for stomach and chest pain and who prescribed Carafate

(treatment and prevention of stomach ulcers), Zoloft, Prilosec (treatment of ulcers and

gastroesophageal reflux disease by decreasing the amount of acid produced in the

stomach), nitroglycerin patch (prevents of angina attacks by dilating the blood vessels,

thereby making it easier for the heart to pump), "Vecamil" and Trazadone (for

depression, sleep problems, agitation).  (R. 68).  Plaintiff claimed that in 1985 a

physician at the New England Back Center in Burlington, Vermont, advised Plaintiff to

limit his activities.  (R. 70).  Plaintiff listed his daily activities as cooking, cleaning, and

small chores; he participated in no recreational activities or hobbies, social visits were

limited to people he met with at Narcotics Anonymous ("NA") and Alcoholics

Anonymous ("AA") meetings, which he attended by either riding in a van or a bus.  (R.

70).  On a Vocational Report, Plaintiff listed his most recent jobs as delivering pizza

between 1989 and 1991, and in 1993, and working as a laborer for an insulation

company in 1985 and 1986.  (R. 75).

     In a Daily Activities Questionnaire, Plaintiff stated he lived in a halfway house

with 16 other people, cooked a meal once a month by himself, did not go grocery shopping, performed a daily chore which changed weekly, read, watched television, attended AA and NA meetings, that he met a lot of people in recovery, he traveled by public transportation by himself and used a van to get to his AA and NA meetings, he did not pay any bills because he could not handle money, and that his drug and alcohol abuse caused him to either be fired from or to quit his previous jobs.  (R. 81-83). Plaintiff did not complete the portion of the form requesting names of people to be contacted for more information about Plaintiff's daily life, explaining that he has a hard time relating to people.  (R. 82-83).

On a Disability Claim Questionnaire, Plaintiff stated he sometimes had pain in the center of his chest which radiated into his arm and for which he took nitroglycerin. (R. 84).  Plaintiff further explained that he also had back pain when lifting more than 15 pounds and which bothered him if he stood too long, bent over and performed simple chores.  (R. 85).  According to Plaintiff, he had a hard time dealing with people now that he is sober.  (R. 86).

Plaintiff's claims in his papers filed in support of his disability benefits application were corroborated by a Donald Schultz who, on May 2, 1996, completed a Third Party Disability Claim Questionnaire.  (R. 88-89).

On May 28, 1996, Plaintiff went to the emergency room at Buffalo General Hospital complaining of increased depression and suicidal thoughts.  (R. 384-97, 432-34).  Plaintiff, who reported he had been in remission from heroin abuse for seven months, was admitted with a diagnosis of dysthymia and opiate dependence.  (R. 385, 433).  Plaintiff was examined by Hak Ko, M.D. ("Dr. Ko"), who observed Plaintiff "was in

good control and contact," but "appeared quire blunted and preoccupied and depressed."  (R. 385, 433).  Plaintiff was admitted for treatment and was treated daily with Prozac, supportive individual psychotherapy and group therapy and "showed a gradual improvement with a brightening affect, not as withdrawn or preoccupied . . . . denied any suicidal ideas . . . [and] was willing to followup with Spectrum New Alternative MICA Program after his discharge."  (R. 385, 433).  Plaintiff was discharged on June 10, 1999 with a diagnosis of dysthymia and opiate dependence.  (R. 385, 433).

On a Psychiatric Review Technique completed by psychiatrist Jin-See Rhee, M.D. ("Dr. Rhee") on June 14, 1996, Dr. Rhee indicated there was insufficient medical evidence to make a medical disposition regarding Plaintiff.  (R. 100).

On July 12, 1996, Plaintiff returned to Buffalo General for heroin detoxification. (R. 446-54).  Plaintiff was treated with lithium and methadone and discharged on July 18, 1996.  (R. 447).  On July 30, 1996, however, Plaintiff was admitted to Sheehan Memorial for drug detoxification, claiming he had a $ 140 per day intravenous heroin use habit, and drank two six-packs a day.  (R. 466-71).  Upon his admission, Plaintiff was experiencing black outs, depression, fatigue, cramps, nausea, irritability and rhinorrhea (runny nose).  (R.466).  Plaintiff reported receiving past detoxification treatments at Columbus, ECMC, Sheehan and Niagara Falls Memorial Medical.  (R. 466).  Plaintiff's past medical history was remarkable only for hypertension and an allergy to Talwin was noted.  (R. 466).  Physical examination by Kenneth C. Miller, M.D. ("Dr. Miller") was remarkable for cutis anserine (goose bumps), multiple fresh intravenous tracks, and a tremor was present.  (R. 466).  Dr. Miller's impression was diacetylmorphine dependence withdrawal, hypertension, and ethanol dependence

withdrawal, and the plan was to detoxify Plaintiff with methadone, valium and fluids.  (R. 466).  On August 1, 1996, Oscar Lopez, M.D., P.C. ("Dr. Lopez"), performed a psychiatric evaluation on Plaintiff.  (R. 472-77).  Dr. Lopez noted Plaintiff's medical history included a cardiac illness, history of infarction with angioplasty, and multiple suicide attempts with both wrist cutting and overdosing, and diagnosed dysthymic disorder.  (R. 472).  Plaintiff had last worked in 1991 delivering pizzas, but his drug abuse caused him to quit the job.  (R. 476).  Plaintiff's symptoms included tremors and shakes, anxiety, nausea, blackouts, memory loss, sleep problems, chills, stomach cramps, loss of appetite, weight loss, depression and bone aches.  (R. 476).  Dr. Lopez observed that Plaintiff was irritable, angry and agitated, had an appropriate affect, articulate speech, coherent voice quality and appropriate judgment.  (R. 476).  Plaintiff had been arrested approximately 12 times, including twice within the previous year, all his arrests were drug-related, and Plaintiff was, at that time, on parole, on probation and had criminal cases pending. (R. 476).  Plaintiff's abilities to make and carry out plans and to carry out responsibilities were intact, he had insight into the nature of his condition, and was oriented as to person, place, time and situation.  (R. 477).  Dr. Lopez recommended encouraging Plaintiff to proceed with his application for a methadone maintenance program as well as a rehabilitation program, which Plaintiff resisted.  (R. 472).  When Plaintiff was discharged on August 6, 1996, his depression was improved and he was given prescriptions for non-steroidal medication for bone pain.  (R. 466).

On August 11, 1996, Plaintiff went to the Niagara Falls Memorial Medical Center emergency room complaining of a rapid heartbeat.  (R. 437-43).  Chest X-rays was

negative (R. 439), and ECG was normal with normal sinus rhythym of 73 beats per minute.  (R. 440).

On March 7, 1997, Plaintiff was examined on a consultative basis by psychologist K.C. Sharma, D.M. & S.P. ("Dr. Sharma"), who noted Plaintff traveled alone by public transportation to his appointment.  (R. 398-400).  Plaintiff reported a 32-year history of abusing alcohol and drugs, including cocaine, heroin, opiates and marijuana.  (R. 398).  Plaintiff stated he was currently in a methadone maintenance program, but still used heroin once a month, and had been in 15 detoxification programs and five or six chemical abuse rehabilitation programs.  (R. 398).  Plaintiff was charged with driving under the influence of alcohol on one occasion, and had been arrested eight to ten times.  (R. 398).  Plaintiff reported suicidal thoughts, alleged 30 suicide attempts, and claimed to have been admitted nine times to psychiatric centers for suicide attempts.  (R. 398).  According to Plaintiff, he had experienced paranoid thoughts and depression for most of his life, and abused drugs to make him feel better, claiming he only felt good when he was under the influence of drugs.  (R. 398).  Plaintiff reported he was fired from his last job delivering pizzas because he was unable to get along with other people at work and believed he could not work because he did not like anybody, he was accused of taking money, and he did not like people "bossing" him around.  (R. 398).  Dr. Sharma observed that Plaintiff stood 6' tall and weighed 230 points, had a large scar on his left arm from suicide attempts and his right arm was in a splint.  (R. 398).  Plaintiff's dental hygiene was poor and his breath had an odor.  (R. 398).

Plaintiff presented as suspicious, uncomfortable and anxious, avoided eye

contact, asked for assurance and was hypervigilant, stating he was "nervous" that someone might call the police on him and that he did not trust anyone.  (R. 399). Plaintiff's affect was fearful with a "sad quality," and Plaintiff described his mood as "[p]eople think I am mad most of the time.  I get agitated.  People call the cops on me.  I feel scared all the time."  (R. 399).  Dr. Sharma observed paranoid thoughts, although Plaintiff denied hallucinations, obsessions or phobias.  (R. 399).  Plaintiff's orientation was intact as to all spheres, and his intelligence was estimated in the average range, noting Plaintiff was expelled from school at age 16 in the 9th grade for fighting.  (R. 399). Plaintiff reported experiencing suicidal thoughts on a daily basis, and had a history of violence toward his spouse and others, although he denied any current suicidal plans. (R. 399).  Insight was fair as to chemical abuse, and poor as to paranoid perceptions. (R. 399).  Plaintiff's judgment was assessed as poor given his multiple arrests, suicide attempts and paranoid thoughts.  (R. 399).  Plaintiff spent his days making jigsaw puzzles and watching television, but did not go out because he did not get along with people, lived with another man with whom he shared chores and bills.  (R. 399).  Dr. Sharma diagnosed polysubstance abuse, dythymic disorder (mild depressive disorder characterized by an irritable mood), and paranoid personality disorder.  (R. 399).  Dr. Sharma's recommendation was that Plaintiff would benefit from a day treatment drug rehabilitation program, but noted that Plaintiff's paranoid thoughts cause him to avoid people, he continued to use heroin once a month despite a methadone program and that Plaintiff needed to continue taking Paxil for depression.  (R. 400).  Plaintiff's prognosis was poor, and he was irresponsible with funds, stating he gave his money to his roommate to pay bills because Plaintiff was careless with money.  (R. 400).

In a Residual Functional Capacity Assessment form completed on April 1, 1997, by J. Curley, Ph.D. ("Dr. Curley"), on a consultative basis, Plaintiff was found to have a substance abuse problem, which rendered him moderately limited in his abilities to maintain attention and concentration for extended periods of time, and to perform activities within a schedule, maintain regular attendance, to be punctual within customary tolerances, and to respond appropriately to changes in the work settings, but Plaintiff was otherwise not significantly limited as to understanding and memory, sustained concentration and persistence, social interaction and adaptation.  (R. 96-97). Dr. Curley further remarked that Plaintiff can understand and follow directions, had no impairment except for substance abuse, and that Plaintiff could adapt to routine demands.  (R. 98).

On a Psychiatric Review Technique completed by Dr. Curley on April 1, 1997, Plaintiff was found to have a substance abuse disorder which did not meet or equal a listed impairment.  (R. 109-17).  Because of his substance abuse disorder, Plaintiff was slightly limited as to his activities of daily living and maintaining social functioning, seldomly experienced deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and had one or two episodes of deterioration or decompensation in work or work-like settings causing Plaintiff to withdraw from the situation or to experience an exacerbation of signs and symptoms. (R. 116).

On September 8, 1997, Plaintiff was evaluated for treatment for emotional and substance abuse at the Monsignor Carr Institute's St. Joseph's Day Training Program. (R. 566-71).  Medical Director and Psychiatrist Demetrio Fajardo, M.D. ("Dr. Fajardo"),

examined Plaintiff, observing Plaintiff had good eye contact, but was "fidgety" when tense.  (R. 566).  Plaintiff reported multiple symptoms suggestive of a possible attention deficit disorder, his mood was labile, affect was appropriate, Plaintiff was awake and alert, his attention and concentration span were fair to poor with Plaintiff glancing from side to side, Plaintiff was easily bored, memory was intact, he denied suicidal or homicidal ideation, judgment was somewhat limited and insight was partial.  (R. 566).  Dr. Fajardo diagnosed depressive disorder, not otherwise specified, possible untreated adult attention deficit hyperactivity disorder, and opiates dependence.  (R. 566).  Plaintiff's current stressors included poor social and family relations, and financial, legal and relational difficulties.  (R. 567).  Plaintiff's current Global Assessment of Functioning score ("GAF")[7] was 50 to 55.  (R. 567).  Plaintiff was admitted for treatment services.  (R. 579-86, 591).

On December 11, 1997, Plaintiff went to ECMC's emergency room, complaining of increasing dysphoria and violent impulses toward a fellow resident in the group home in which Plaintiff then resided.  (R. 416-23).  The attending physician, George J. Burnett, M.D. ("Dr. Burnett"), found Plaintiff had no intent or plan to harm himself or others, and Dr. Burnett's impression was major depression, recurrent, by history, and adjustment disorder with depressed mood.  (R. 416, 418).  Plaintiff was discharged to a YMCA group home where he was to continue taking Wellbutrin, and was also advised to continue his methadone maintenance program, the Pathways Program run by Sisters

---

[7] The Global Assessment of Functioning ("GAF") Scale is a rating, on a scale of 0 - 100, of overall psychological functioning, with a higher number associated with higher functioning.  A GAF of 50 to 55 indicates moderate difficulty in social, occupational or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th ed. (1994) at 818.

Hospital in Buffalo, New York.  (R. 416, 424-29).

On December 16, 1997, Plaintiff was evaluated at ECMC for depression.  (R. 404-15).  Plaintiff denied any physical complaints, but reported he often had suicidal thoughts, but no current plans.  (R. 404-05).  Upon examination, Plaintiff was well oriented but appeared chronically depressed.  (R. 405).  Plaintiff was diagnosed with depressive disorder, not otherwise specified, and a history of polysubstance abuse.  (R. 404, 407).  It was noted that Plaintiff had been approved by Transitional Services, Inc. ("TSI") for Level II housing, but that there were two people ahead of Plaintiff on the housing list, and Plaitniff was to move into another rooming house owned by his current landlord, until there was an opening at TSI.  (R. 415).  It was noted that Plaintiff's sister in Connecticut had sent Plaintiff a bus ticket to visit over the holidays, and that Plaintiff's methadone treatment program at Sisters Hospital had agreed to provide Plaintiff with enough methadone for his holiday visit.  (R. 415).  Plaintiff was grateful for the supporting crisis residence stay was pleased with the positive steps and directions in his life.  (R. 415).

On January 26, 1998, Plaintiff moved into a group home run by TSI, a non-profit organization providing counseling services and training to those diagnosed with a mental disorder, where Plaintiff was provided with 24 hour staff support and supervision.  (R.  518-19; 563-65, 568, 572-74).  Plaintiff's counselor, Mark Sember ("Sember"), reported on June 15, 1998 that Plaintiff had a dual diagnosis of depressive disorder, not otherwise specified, and opioid dependence.  (R. 518).  Plaintiff had daily contact with either Sember or another staff person and had proven to be compliant with his treatment, although at times he displayed resistence because of ongoing life

25

frustrations and periods of depression resulting in multiple medication changes.  (R. 518).  Plaintiff displayed fair insight into his problems but at times lacked the motivation to work through his issues.  (R. 518).  Plaintiff was easily frustrated and depressed if he was not making sufficient progress and he continued to work with the staff to clarify his judgment and perception which, at times, were poor.  (R. 518).  Plaintiff demonstrated good organizational and time management skills, usually following through with assigned tasks and scheduled appointments, but was prone to isolating himself, especially when depressed.  (R. 518).  Plaintiff's social functioning was poor and Plaintiff frequently expressed dissatisfaction with others, displayed unrealistic expectations for others and was quick to find fault with others.  (R. 518).  Plaintiff had a low capacity for stress and was easily overwhelmed and agitated.  (R. 518).  Mr. Sember summarized that

> [a]t this time [Plaintiff] displays a low capacity for sustained gainful employment dues to his diminished coping abilities, increased depression and marginal social skills.  Although [Plaintiff] verbalizes a desire to work and excel in all facets of his life, [Plaintiff's] depression and low tolerance for stress make employment an unrealistic endeavor, and may jeopardize the gains [Plaintiff] has made thus far.

(R. 519).

In a Physician's/Medical Officer's Statement of Patient's Capability to Manage Benefits form completed on February 4, 1998 in connection with Plaintiff's disability benefits application, Dr. Fajardo checked boxes indicating his opinion that Plaintiff was not capable of managing or directing the management of benefits in his best interest, either at that time of in the future.  (R. 59-60).  Dr. Fajardo explained that given Plaintiff's history of substance abuse and sociopathic tendencies, a safer "payee" for benefits would be TSI where Plaintiff currently lived.  (R. 60).  The form defines

"capable" as "able to understand and act on the ordinary affairs of life, such as providing for own adequate food, housing, clothing, etc.," and "able, in spite of physical impairments, to manage funds or direct others how to manage them."  (R. 60).

On June 4, 1998, Jerry Kashin M.D. ("Dr. Kashin") of Spectrum Human Services completed a medical report and assessment of Plaintiffs' ability to work in connection with Plaintiff's disability benefits application.  (R. 529-36).  Dr. Kashin reported Plaitniff's diagnosis as depressive disorder, opiate dependence, and personality disorder, not otherwise specified.  (R. 529).  Plaintiff's current symptoms included "severe difficulty getting along" with others and sharing his room, depression, flat affect, lethality thoughts, tears, poor impulse control, unresolved family abuse, distrust of others, no delay of gratification, poor self worth, history of self harm, problems with sleep, and racing thoughts.  (R. 529).  Dr. Kashin noted Plaintiff reported his medical history includes that Plaintiff is legally blind in his left eye, history of two heart attacks, history of hypertension and history of esophageal varices (hemorrhoids).  (R. 530).  Plaintiff had a poor outlook for the future, and had fatigue secondary to depression.  (R. 530, 531). Plaintiff was neat with good personal hygiene, had no thought process problems but presented with a depressed and flat affect, preoccupation of thoughts caused poor concentration, and orientation, but his memory, information, insight and judgment were fair, while Plaintiff's ability to perform calculations, including serial sevens (counting backward from 100 in increments of seven) was good.  (R. 532-33).  Plaintiff was living in Level I supporting housing and was able to perform self care and grooming, but was unable to handle money and had no interests or hobbies.  (R. 533).

Dr. Kashin found that Plaintiff displayed suicidal features, explaining that on June

1, 1998, Plaintiff became angry with a TSI counselor for not giving Plaintiff what he wanted and stated he wanted to "do himself in." (R. 534). Plaintiff was also incapable of handling any payment benefits because for Plaintiff, money was a "trigger" for him to return to drug usage. (R. 534). It was Dr. Kashin's opinion that Plaintiff has no physical limitations regarding Plaintiff's ability to work (R. 534), but that Plaintiff's communicative ability was limited as he was unable to express himself at times and unaware of his own feelings of anger and rage, and Plaintiff's memory was fair, but limited as to the past and present and information. (R. 535). Dr. Kashin reported Plaintiff's ability for sustained concentration and persistence was limited as Plaintiff works poorly with others, reports concentration problems, cannot sustain the regular routine of a job and had a history of short term duration of jobs. (R. 535). Plaintiff's social interaction was limited insofar as Plaintiff struggles to work with others and claimed that he does not like or trust other people. (R. 535). Plaintiff's adaptation ability, *i.e.*, to respond appropriately to changes in a work setting, was limited as Plaintiff is unable to delay gratification. (R. 536). Another factor Dr. Kashin found significant to Plaintiff's recovery is Plaintiff's "disbelief that he can feel better than he is feeling." (R. 536). Dr. Kashin opined that Plaintiff was "unable to maintain employment due to explosive temper and lack of follow through with instructions." (R. 533).

At the administrative law hearing held before ALJ Zahm on June 16, 1998, Plaintiff testified that he drove on a daily basis until 1995 and that he could still drive, but because he no longer owned a motor vehicle, he used public transportation, including buses, or shared rides with others. (R. 600-01). Plaintiff explained his last job was delivering pizzas, but that he left the job because he was constantly losing money,

had trouble dealing with other people, was argumentative and had an argument with his boss who advised Plaintiff to take some time off, following which Plaintiff never returned.  (R. 601-03).  Plaintiff also had worked installing home insulation and detailing cars.  (R. 603-04).

Plaintiff described a typical day as awakening at 7:30 or 8:30 A.M., walking to Pathways, his methadone maintenance program, after which he attended a group therapy meeting or an individual counseling session, then wandered around downtown for a while, often stopping at a soup kitchen for lunch, and returned to the halfway house around 2:00 P.M., where he would lay around until dinner time, after which he would perform his assigned daily chore.  (R. 606-07, 611).  Plaintiff then returned to his room until the next morning, unless he went downstairs for a snack or to smoke cigarettes.  (R. 607).  Plaintiff clarified that on the weekends, his routine varied as he did not go to the methadone maintenance program but, rather, had "take-out privileges" which allowed him to take receive his methadone dose at the halfway house.  (R. 610). Plaintiff took the bus to his therapy and counseling sessions.  (R. 610-11).  Plaintiff testified he could cook, wash dishes, sweep, mop, vacuum, do laundry, and did not grocery shop, although he would sometimes go into a store to purchase cigarettes.  (R. 612-13).  Prior to moving into the halfway house, however, Plaintiff did grocery shop. (R. 613).  Plaintiff did not do any yard or garden work and had no hobbies, although he used to enjoy attending custom auto shows, refinishing wood, and going to the movies. (R. 613-14).

Earlier that year, Plaintiff, using a ticket purchased by his mother, had taken an airplane to Florida where he visited for nine days with his mother and stepfather who

took him to Disneyworld and out to dinner.  (R. 614-15).  Plaintiff, using a ticket paid for

by his family, had taken a bus to Connecticut to visit with his sister over the previous

Christmas holiday.  (R. 615).  In May 1997, Plaintiff traveled by bus to his daughter's

wedding in Vermont where he stayed for two weeks.  (R. 615-16).  Plaintiff had also

traveled by bus to Bradford for his aunt's funeral, and stayed in Bradford for three days.

(R. 616).

Plaintiff testified he has a heel spur which sometimes made walking and

prolonged standing difficult, but that he was able to commute on the local Metro rail

system.  (R. 616-17).  Plaintiff also claimed to have injured his back when he worked as

an insulation installer for L & W Insulation Company ("L & W") in Vermont, a job that he

left in 1987, and that his back injury caused him to miss work for awhile.  (R. 617).

According to Plaintiff, L & W initially paid for Plaintiff to receive physical therapy for his

back injury, although when nothing more could be done, the therapy was discontinued

and Plaintiff has not received any treatment for his back since at least 1990.  (R. 619-

20).  Plaintiff was unable to identify the most recent physician who treated his back, but

stated that he was advised not to lift more than 10 pounds.  (R. 620-21).  Plaintiff stated

he did not carry anything other than his "little bag."  (R. 621).

When questioned about his drug use, Plaintiff testified that in June 1993 he was

using opiates, in the form of Darvon, and heroin.  (R. 622).  Plaintiff, on a daily basis,

took 30 Darvon tablets and used between two and five bags of heroin, but he had been

clean since December 1996.  (R. 623-24)  Plaintiff explained he received prescriptions

from various doctors for Darvon, and financed his drug habit by shoplifting and stealing

or by borrowing money from relatives.  (R. 624-27).

Plaintiff described his inability to get along with people as interfering with his ability to work, explaining that he did not like people, did not want to be around them, and often got into fights with people.  (R. 627).  Plaintiff testified he had problems with his memory, forgot things on a daily basis, was often unable to remember his own telephone number, and had difficulty concentrating.  (R. 627-28).  According to Plaintiff, he was unable to remember how to operate a cash register.  (R. 628).  Plaintiff further testified that he "mind is jumbled a lot," explaining that he cannot read the newspaper because his mind is "going a mile a minute."  (R. 629).

During the hearing, Plaintiff's attorney stated that Plaintiff was amending his alleged disability onset date to December 26, 1996, based on Plaintiff's alleged sobriety date.  (R. 628-29).  The ALJ accepted the amendment.  (R. 629).  Plaintiff, when questioned about a recent urine sample that indicated Plaintiff was still using drugs, attributed the positive sample to an error by the facility administrator in handling the sample collection bottles.  (R. 636-37).  Plaintiff also denied that he had recently been arrested for drugs, explaining that he had been arrested for shoplifting, but that the charge was dropped in favor of a disorderly conduct charge.  (R. 635-36).  Plaintiff also testified that when he traveled to Connecticut to visit his sister over during the previous Christmas holiday season, he was able to continue his methadone treatment by bringing the methadone dosages with him because he had been in the program long enough to qualify for the "take out" program.  (R. 639).

Plaintiff concluded his hearing testimony by stating his only motivation was his children, with whom he wanted to start a relationship, and the recent birth of a granddaughter.  (R. 639).  Plaintiff claimed he was "tired of being the way I was," that

he no longer wanted to break the law or to end up in jail, and that if he could just "get a handle" on his life's situation, he could "get a job and work and act like a normal responsible person."  (R. 640).

On June 17, 1998, Eva Horvath ("Horvath"), a certified alcohol and substance abuse counselor with Spectrum Human Services, opined that she had known Plaintiff since May 12, 1998, and that Plaintiff was assigned to group therapy twice a week and individual sessions once a week.  (R. 528).  Plaintiff was in compliance with treatment expectations and had been drug free for fifteen months, but continued to have "many psychiatric symptoms that cause major problems in his life."  (R. 528).  Horvath further stated Plaintiff "is impulsive and is easily frustrated when he doesn't obtain immediate gratification.  He is agitated and reports lethality ideation."  (R. 528).  Plaintiff's judgment and insight to his problems was poor, he lived in a structured environment and needed the regular support of staff to deal with others.  (R. 528).  According to Horvath, Plaintiff "has left group" when he feels it is a waste of his time, and was unable to tolerate stress or to concentrate on the task at hand.  (R. 528).  Horvath concluded Plaintiff "is unable to handle the stressors of work and 'explodes' inappropriately."  (R. 528).

## DISCUSSION

### Disability Determination Under the Social Security Act

An individual is entitled to disability insurance benefits under the Social Security Act if the individual is unable

> . . . to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to
> result in death or which has lasted or can be expected to last for a

>continuous period of not less than 12 months.... An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A) & 423(d)(2)(A), and 1382c(a)(3)(A) & 1382c(a)(3)(C)(i).

Once the claimant proves that he is severely impaired and is unable to perform any past relevant work, the burden shifts to the Commissioner to prove that there is alternative employment in the national economy suitable to the claimant. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). "In assessing disability, the [Commissioner] must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Monguer v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).

A.    <u>**Standard and Scope of Judicial Review**</u>

The standard of review for courts reviewing administrative findings regarding disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law judge's findings are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence requires enough evidence that a reasonable person would "accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Board*, 305 U.S. 197, 229 (1938).

When the Commissioner is evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts,

subjective evidence of pain or disability (testified to by the claimant and others), and . . .

educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d

1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).  If

the opinion of the treating physician is supported by medically acceptable techniques

and results from frequent examinations, and the opinion supports the administrative

record, the treating physician's opinion will be given controlling weight.[8]  *Schisler v.*

*Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d); 20 C.F.R. §

416.927(d).

The Commissioner's final determination will be affirmed, absent legal error, if it is

supported by substantial evidence.  *Dumas v. Schweiker, supra*, at 1550; 42 U.S.C. §

405(g); 42 U.S.C. § 1383(c)(3).  "Congress has instructed . . . that the factual findings of

the Secretary,[9] if supported by substantial evidence, shall be conclusive."  *Rutherford v.*

*Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The federal regulations set forth a five-step analysis that the Commissioner must

follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520,

416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*,

675 F.2d 464 (2d Cir. 1982).  The first step is to determine whether the applicant is

---

[8] The treating physician's opinion is given greater weight because of the "continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient."  *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

[9] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.  In accordance with § 106(d) of that Act, the Commissioner of Social Security has been substituted for the Secretary of Health and Human Services as the defendant in this action.

engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the individual is engaged in such activity the inquiry ceases and the individual cannot be eligible for disability benefits.  *Id.*  The next step is to determine whether the applicant has a severe impairment which significantly limits his physical or mental ability to do basic work activities, as defined in the regulations.  20 C.F.R. §§ 404.1520(c), 416.920(c).  Absent an impairment, the applicant is not eligible for disability benefits. *Id.*  Third, if there is an impairment and the impairment, or an equivalent, is listed in Appendix 1 of the regulations and meets the duration requirement, the individual is deemed disabled, regardless of the applicant's age, education or work experience, 20 C.F.R. §§ 404.1520(d), 416.920(d), as, in such a case, there is a presumption that an applicant with such an impairment is unable to perform substantial gainful activity.[10]  42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920.  *See also Cosme v. Bowen*, 1986 WL 12118, at *2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646 F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in Appendix 1, the Commissioner must then consider the applicant's "residual functional capacity" and the demands of any past work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the applicant can still perform work she has done in the past, the applicant will be denied disability benefits.  *Id.*  Finally, if the applicant is unable to perform any past work, the Commissioner will consider the individual's "residual functional capacity," age, education and past work experience in order to determine whether the applicant can

---

[10] The applicant must meet the duration requirement which mandates that the impairment must last for at least a twelve month period.  20 C.F.R. §§  404.1509 and 416.909.

perform any alternative employment.  20 C.F.R. §§ 404.1520(f), 416.920(f).  *See also*

*Berry v. Schweiker, supra*, at 467 (where impairment(s) are not among those listed,

claimant must show that he is without "the residual functional capacity to perform [his]

past work").  If the Commissioner finds that the applicant cannot perform any other

work, the applicant is considered disabled and eligible for disability benefits.  *Id.*  The

applicant bears the burden of proof as to the first four steps, while the Commissioner

bears the burden of proof on the final step relating to other employment.  *Berry, supra*,

at 467.  In reviewing the administrative finding, the court must follow this five-step

analysis to determine if there was substantial evidence on which the Commissioner

based her decision.  *Richardson v. Perales*, 402 U.S. 389 (1971).


**B.**  **Substantial Gainful Activity**

The first inquiry is to determine whether the applicant is engaged in substantial

gainful activity.  "Substantial gainful activity" is defined as "work that involves doing

significant and productive physical or mental duties and is done for pay or profit."  20

C.F.R. §§  404.1510 and 416.910.

In this case, the ALJ concluded that Plaintiff had not engaged in substantial

gainful activity since December 26, 1996, the alleged onset date of his disability.  (R.

19).  That finding is undisputed.


**C.**  **Severe Physical or Mental Impairment**

The next step of the analysis is to determine whether the applicant had a severe

physical or mental impairment significantly limiting his ability to do "basic work

activities."  "Basic work activities" are defined as "the abilities and aptitudes necessary

to do most jobs."  20 C.F.R. §§ 404.1521(b), 416.921(b).  "Basic work activities" include

walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing,

hearing, speaking, understanding, carrying out, remembering simple instructions, use of

judgment, responding appropriately to supervision, co-workers and usual work

situations, and dealing with changes in a routine work setting.  20 C.F.R. §§

404.1521(b), 416.921(b).  Further, a physical or mental impairment is severe if it

"significantly limit[s]" the applicant's physical and mental ability to do such basic work

activities.  20 C.F.R. §§ 404.1521(a), 416.921(a) (bracketed text added).

        The ALJ concluded that the medical evidence establishes Plaintiff depressive

and personality disorders causing some degree of limitation.  (R. 19).  That finding is

also undisputed.  The ALJ then continued on to the next step, a finding of whether

Plaintiff's condition was severe enough to be set forth in the Listing of Impairments at

Appendix 1, 20 C.F.R. Pt. 404, Subpt. P, Regulation No. 4 ("the Listing of

Impairments").


**D.    Listing of Impairment, Appendix 1**

        The third step is to determine whether a claimant's impairment or impairments

are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P.  If the

impairments are listed in the Appendix, they are considered severe enough to prevent

an individual from performing any gainful activity.  20 C.F.R. § 404.1525(a).  Here, the

ALJ determined that although Plaintiff has depressive and personality disorders causing

some degree of limitation, he does not have an impairment or combination of

impairments listed in or medically equal to one listed in the Listing of Impairments.  (R.
19).  Specifically, the ALJ found that Plaintiff has an affective disorder which she
characterized as a mild depressive disorder (R. 21-22), an nonspecified personality
disorder (R. 21-22), and a substance abuse disorder, specifically, opiate dependence in
substantial remission.  (R. 21, 23).  Upon review, the court finds that substantial
evidence supports the ALJ's determination that Plaintiff's depressive and personality
disorders do not meet the criteria established in the Listing of Impairments.

The relevant listing impairments indicated in Plaintiff's situation, as alleged in
Plaintiff's disability benefits application, are § 1.04 (disorders of the spine), § 4.04
(ischemic heart disease), § 12.04 (affective disorder), § 12.08 (personality disorder),
and § 12.09 (substance abuse disorder).  20 C.F.R. Pt. 404, Subpt. P, Appendix 1, §§
12.04, 12.08 and 12.09.  Preliminarily, the court considers whether the record
establishes Plaintiff is disabled by his back pain or a heart condition.  A disabling spine
disorder requires evidence of nerve-root compression, or spinal arachnoiditis, or lumbar
spinal stenosis. § 1.04A, B and C.  Disability based on ischemic heart disease requires
chest discomfort with myocardial ischemia (insufficient blood supply to the heart thereby
depriving the heart of oxygen). § 4.04.

In the instant case, the record is devoid of any suggestion or opinion by any
medical doctor or other treating source, or any other evidence establishing Plaintiff's
back pain or heart condition meet the criteria of the relevant listing impairments, *i.e.*, §
1.04 and § 4.04.  The record also fails to establish that Plaintiff received any treatment
for his back after 1990.  Although Plaintiff reported on at least two occasions that he
has a history of myocardial infarctions, (*see* R. 194 (July 22, 1994 Sheehan Memorial

History and Physical indicating Plaintiff reported having myocardial infarction three to four years earlier), R. 223 (June 20, 1995 Brooks Memorial Emergency Case Report indicating Plaintiff reported history of myocardial infarction three years earlier), and R. 466 (August 6, 1996 Sheehan Memorial Discharge Summary listing one of Plaintiff's discharge diagnoses as "status post myocardial infarction")), there is no medical evidence in the record supporting such claim and, in fact, it is reported on Plaintiff's January 23, 1993 Discharge Summary and treatment notes from Lawrence and Memorial Hospital, where Plaintiff was admitted on January 19, 1993 with complaints of chest pain, that myocardial infarction was ruled out as the cause.  (R. 181-87).  Moreover, although the record establishes Plaintiff has had occasional angina, for which he has been prescribed and treats with nitroglycerin patches, there is no evidence that Plaintiff's angina in any way impacts Plaintiff's ability to work.  As such, the record supports the ALJ's determination that neither Plaintiff's back pain nor his angina is a disabling condition (R. 14-15).  The court next considers whether the record supports the ALJ's determination that Plaintiff is not disabled by depression which is an affective disorder.

According to § 12.04 of the Listing of Impairments, disabling affective disorders are

> [c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level for severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A.  Medically documented persistence, either continuous or intermittent, of one of the following:

1.  Depressive syndrome characterized by at least four of the following:

    a.  Anhedonia or pervasive loss of interest in almost all activities; or

    b.  Appetite disturbance with change in weight; or

    c.  Sleep disturbance; or

    d.  Psychomotor agitation or retardation; or

    e.  Decreased energy; or

    f.  Feelings of guilt or worthlessness; or

    g.  Difficulty concentrating or thinking; or

    h.  Thoughts of suicide; or

    i.  Hallucinations, delusions or paranoid thinking;

or

2.  Manic syndrome

\* \* \*

or

3.  Bipolar syndrome[11]

\* \* \*

AND

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence or pace; or

4.  Repeated episodes of decompensation, each of extended duration;

OR

C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more that a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

---

[11] Nothing in the record indicates, nor does Plaintiff claim, that Plaintiff suffers from either a manic syndrome or a bipolar disorder.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04.

In the instant case, the record establishes that Plaintiff meets the criteria under § 12.04A.1, regarding a depressive syndrome, characterized by at least four of nine symptoms specified under subpart A, including (1) anhedonia or pervasive loss of interest in almost all activities; (2) feelings of guilt or worthlessness; (3) difficulty concentrating or thinking; and (4) thoughts of suicide.  The record, however, fails to establish that Plaintiff also meets, as required, the criteria established under subpart B of subpart C.  In particular, although there is evidence in the record that Plaintiff's depressive disorder has had a negative impact on his activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, the Commissioner correctly found that such restrictions and difficulties are not marked as required by 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04B.1-3, but, rather, are only mild or moderate.  Furthermore, the record is devoid of any evidence that Plaintiff has had repeated episodes of decompensation, each of extended duration, as required by 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04B.4.

Nor does the record contain evidence establishing Plaintiff's depressive disorder "has caused more that a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," accompanied by "repeated episodes of decompensation, each of extended duration," or a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate" or a "current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of

continued need for such an arrangement," as required by 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04C.  Not only is the record is devoid of any reference to Plaintiff having "repeated episodes of decompensation, each of extended duration," the record also fails to establish Plaintiff suffers from a residual disease process resulting "in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."

Significantly, nothing in the record indicates that Plaintiff, upon moving into the halfway house, which undoubtedly was a change in environment given that his continued stay in the halfway house is conditioned on the completion of daily chores, attending a daily methadone maintenance program and daily participation in either group therapy or individual counseling, experienced any decompensation.  In fact, a finding that Plaintiff's depression renders him unable to cope with any minimal increase in mental demands or change in environment would be inconsistent with Plaintiff's success in maintaining his residence in the halfway house.  Similarly, a finding that Plaintiff was unable to cope with any increase in mental demands or change in environment would be inconsistent with Plaintiff's undisputed use of public transportation, both locally for regular attendance at counseling sessions and to travel to the soup kitchen where he often eats lunch, as well as for long-distance travel, including Plaintiff's bus trips to Connecticut to visit his sister over the previous Christmas holiday, and to Vermont where he stayed for two weeks for his daughter's wedding, as well as Plaintiff's flight to Florida for a nine-day visit with his mother and step-father.  Of further significance is that Plaintiff was able to continue his methadone maintenance program while out of town because Pathways had approved Plaintiff for

their "take-out" program.  The record is barren of any indication that Plaintiff's travels

resulted in any set-back in his methadone maintenance program.  Further, given that at

the time of the administrative hearing on June 16, 1998, Plaintiff, who moved into the

halfway house on January 26, 1998, had been living in supportive housing for less than

five months, there was no basis in the record on which the ALJ could find that Plaintiff

had a "current history of 1 or more years' inability to function outside a highly supportive

living arrangement, with an indication of continued need for such an arrangement," as

required by 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04C.

Accordingly, the record supports the ALJ's determination that Plaintiff's

depressive disorder was not disabling under the criteria set forth in the relevant Listing

of Impairments, *i.e.*, § 12.04.  The court next considers whether the ALJ's determination

that Plaintiff is not disabled by his nonspecified personality disorder is supported by

substantial evidence in the record.

To be disabled based on a personality disorder, a claimant must establish that

the criteria for both A and B, as follows, are satisfied:

A. Deeply ingrained maladaptive patterns of behavior associated with one of the
following:
    1. Seclusiveness or autistic thinking; or
    2. Pathologically inappropriate suspiciousness or hostility; or
    3. Oddities of thought, perception, speech and behavior; or
    4. Persistent disturbances of mood or affect; or
    5. Pathological dependence, passivity or aggressivity; or
    6. Intense and unstable personal relationships and impulsive and
    damaging behavior;
AND
B. Resulting in three of the following:
    1. Marked restrictions of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Deficiencies of concentration, persistence or pace resulting in frequent
    failure to complete tasks in a timely manner (in work settings or

elsewhere); or
4.  Repeated episodes of deterioration or decompensation in work or
work-like settings which cause the individual to withdraw from that
situation or to experience exacerbation of signs and symptoms (which
may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.08.

In the instant case, the record does not support a finding that Plaintiff is disabled

based on a personality disorder.  Particularly, even assuming that Plaintiff exhibited

"deeply ingrained maladaptive patterns of behavior" associated with at least one of the

six separately enumerated subcategories such that Plaintiff can satisfy part A of the

Regulation, the record does not contain any evidence that Plaintiff can satisfy part B, as

required.  The criteria listed under part B are similar to those discussed in connection

with Plaintiff's depressive disorder.  Specifically, although there is evidence in the

record that Plaintiff's depressive disorder has had a negative impact on his activities of

daily living, maintaining social functioning, such restrictions are not marked as required

by 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.08B.1-2, but, rather, are only mild or

moderate.  Similarly, the record establishes Plaintiff's personality disorder has caused

some deficiency of concentration, persistence or pace, but there is no evidence that

such deficiency has resulted in frequent failure to complete tasks in a timely manner,

either in work settings or elsewhere, as required by 20 C.F.R. Part 404, Subpt. P, App.

1 § 12.08B.3.  Finally, even accepting as true Plaintiff's assertions that his personality

disorder, especially his alleged distrust of and dislike for other people caused him to

leave his previous employment, thereby meeting the criteria under § 12.08B.4, requiring

repeated episodes of deterioration or decompensation in work or work-like settings

which caused Plaintiff to withdraw from that situation or to experience exacerbation of

signs and symptoms, Plaintiff still has not met at least two of the other criteria, *i.e.*, marked restrictions of daily living, or marked difficulties maintaining social functioning, or deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner, whether in work settings or elsewhere, as 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.08B requires.

As such, the record fails to establish that at least three of the four separately enumerated conditions listed in part B are present and, therefore, Plaintiff cannot demonstrate disability based on a personality disorder as defined under 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.08.

Nor does the record establish that Plaintiff is disabled based on his substance abuse disorder as defined under § 12.09 which classifies a substance abuse disorder as "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system."  20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.09.  The required level of severity to meet the criteria for a listed impairment is met provided the claimant is also determined to have at least one of the following (1) organic mental disease, (2) depressive syndrome, (3) anxiety disorders, (4) personality disorders, (5) peripheral neuropathies, (6) liver damage, (7) gastritis, (8) pancreatitis or (9) seizures.  20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.09.

Simply put, alcoholism or drug addiction may meet a listing impairment if it results in serious personality disorders as set forth by 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04 or § 12.08, or in a substantial physical impairment.  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)(citing *Singletary v. Secretary of Health, Education and Welfare*, 623 F.2d 217, 220 (2d Cir.

1980).[12]  Next, upon finding such a personality disorder or a substantial physical

impairment, a disability based on alcoholism or drug addition will be found only if there

is a relationship between the substance abuse and the disability.  Specifically, "if there

is a continuing interrelationship between the excess consumption of alcohol and the

disability, such that termination of the former will end the latter, the issue for the

Secretary is whether the claimant has lost the voluntary ability to control his drinking."

*Rutherford, supra* (citing *Adams v. Wienberger*, 548 F.2d 239, 244 (2d Cir. 1977); *see*

*also Sitarek v. Shalala*, 1994 WL 175116, *7 (W.D.N.Y. 1994)(applying the *Rutherford*

standard in determining whether claimant was disabled within the meaning of SSA

based on alcohol and drug addiction).

     In the instant case, the ALJ found that although Plaintiff has a substance abuse

disorder, specifically, opiate dependence, such disorder was "in substantial remission."

(R. 23).  That finding is supported by the record, including by Plaintiff's own testimony at

the administrative hearing.  (*see* R. 624 (Plaintiff testifying he has not used any drugs or

alcohol since December 1996), and R. 628-29 (Plaintiff amending alleged disability

onset date to December 26, 1996, to coincide with his sobriety date)).  Further, given

that the ALJ's determination that Plaintiff's depressive disorder and personality

disorders do not meet the relevant criteria under the Listing of Impairments for §§ 12.04

and 12.08 is supported by substantial evidence in the record, and as the record is

devoid of any evidence substantiating Plaintiff's claimed back pain meets the disability

---

[12] Although *Rutherford* involved a question of disability based only on alcoholism, as alcoholism
and drug addiction are both substance abuse disorders, "it is fair to borrow from the case law regarding
alcoholism in order to consider the standards for drug abuse as a disability."  *Smith v. Sullivan*, 776 F.
Supp. 107, 112 (E.D.N.Y. 1991).

criteria under § 1.04, or that his heart problem meets the disability criteria under § 4.04, or any other physical impairment, as required to have a listed impairment based on substance abuse, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.09, the ALJ could not consider whether Plaintiff's termination of his substance abuse would eliminate such nonexistent depressive or personality disorder or physical impairment.  Nor was there any need for the ALJ to determine whether Plaintiff had lost the ability to control his substance abuse.  *Adams, supra*, at 243-244 (the desire to continue one's substance habits unaccompanied by a mental or physical impairment is insufficient to support a finding of a disability).  Accordingly, the ALJ's determination that Plaintiff's substance abuse does not meet the criteria for a disabling condition under § 12.09 is supported by substantial evidence in the record.

Plaintiff nevertheless maintains the ALJ violated the treating physician's rule by failing to give controlling weight to the opinions of Dr. Kashin and mental health care providers at TSI and Spectrum Human Services that Plaintiff is incapable of working. Plaintiff's Response at 4-5.  The record, however, demonstrates the ALJ did not violate the treating physician's rule.  Generally, the Secretary grants the opinion of a treating physician controlling weight only if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence.[13]  *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); 20 C.F.R. § 404.1527(d).  The Social Security Administration regulations specify the following

---

[13]  Deference is given to the opinions of treating physicians based on the belief that opinions formed as the result of an ongoing physician-patient relationship are more reliable than opinions based solely on examination for the purposes of disability proceedings.  *See Schisler v. Sullivan*, *supra*, at 568.

factors as relevant "in determining the weight to give the [treating physician's] opinion," (1) the frequency of examination and the length, nature, and extent of the treatment relationship, (2) the evidence in support of the opinion, for example, the more evidence presented to support a medical opinion, particularly laboratory findings and other medical signs, the more weight the opinion is entitled to, (3) the opinion's consistency with the record as a whole, (4) whether a specialist formed the opinion, as specialists are entitled to more weight, and (5) other factors which are unspecified, but may contribute to the amount of weight to which a medical opinion is entitled. *Schisler v. Sullivan, supra*, at 567; 20 C.F.R. § 404.1527(d). Further, in order for a condition to be disabling, it must last or be expected to last for a continuous twelve month period. 20 C.F.R. § 404.1509.

Here, the record shows that the ALJ considered that despite Plaintiff's extensive history of seeking treatment for his substance abuse, including multiple hospitalizations and in-patient rehabilitation attempts, Plaintiff has not had significant mental health treatment from a treating source for his depression and personality disorders. (R. 15-16). The ALJ took notice of the fact that Plaintiff, on May 12, 1998, a little more than one month prior to the date of the administrative hearing on June 16, 1998, began seeing Dr. Kashin for his depression. (R. 16). As such, the ALJ gave "very little weight" to Dr. Kashin's opinion of June 4, 1998, less than one month after Plaintiff began treatment with Dr. Kashin, (R. 16) that Plaintiff was "unable to maintain employment due to explosive temper and lack of follow through with instructions." (R. 533). The ALJ also observed that Dr. Kashin's June 4, 1998 report appeared to be based on Dr. Kashin's acceptance of Plaintiff's claims, including Plaintiff's misrepresentation that he

had two heart attacks, rather than on any significant clinical observations.  (R. 16).

Careful review of Dr. Kashin's June 4, 1998 report substantiates the ALJ's

determination, including that the report indicates Plaintiff has a history of two heart

attacks.  (R. 533).  The ALJ also considered significant Plaintiff's "longstanding history

of deception [ ] indicative of continued manipulative behavior."  (R. 16).  Further, Dr.

Kashin did not opine as to how long Plaintiff's disabling condition was expected to last.

Although the record contains other opinions that Plaintiff cannot work, the

opinions are not made by treating physicians.  In particular, Plaintiff's counselor at TSI,

Mark Sember, opined on June 15, 1998 that Plaintiff had a "low capacity for sustained

gainful employment dues to his diminished coping abilities, increased depression and

marginal social skills."  (R. 519).  Also, on June 17, 1998, Spectrum Human Services

certified alcohol and substance abuse counselor Eva Horvath opined that Plaintiff,

whom she began counseling on May 12, 1998, "is unable to handle the stressors of

work and 'explodes' inappropriately."  (R. 528).  The ALJ, however, was not required to

give controlling weight to either Horvath's or Sember's opinion as neither Horvath nor

Sember is a licensed physician or psychologist.  Specifically, although the ALJ is

required to give controlling weight to a "treating source's opinion on the issues(s) of the

nature and severity of your impairment(s)" if it is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques, and in not inconsistent with

the other substantial evidence," 20 C.F.R. § 1527(d)(2), a treating source's opinion

"must be a medical opinion under this provision's controlling weight rule."  *Diaz v.*

*Shalala*, 59 F.3d 307, 313 (2d Cir. 1995).  Further, 20 C.F.R. § 404.1527(c)(1) defines

"medical sources," as relevant to the instant case, as including only licensed physicians

and licensed or certified psychologists.  20 C.F.R. § 404.1513(a)(1) and (2).  As

Horvath and Sember are not licensed physicians or licensed or certified psychologists,

their opinions are not entitled to controlling weight.  Rather, the regulations provide that

the ALJ has discretion to determine the appropriate weight to be accorded the opinions

of counselors, such as Horvath and Sember.[14]  *See Diaz*, *supra*, at 314 (citing 20

C.F.R. § 1513(d) (permitting evidence for other sources to be considered in determining

the severity of a claimant's impairments and how it affects the claimant's ability to

work)).

Finally, the ALJ's determination that Plaintiff's subjective allegations regarding

his functional limitations are not credible (R. 19), is also supported by substantial

evidence in the record.  While subjective complaints are not alone sufficient to support

a finding of disability, such complaints must be accorded weight when they are

accompanied by "evidence of an underlying medical condition" and an "objectively

determined medical condition [which is] of a severity which can reasonably be expected

to give rise to the alleged [subjective complaint]."  *Cameron v. Bowen*, 683 F.Supp. 73,

77 n.4 (S.D.N.Y. 1984).  The ALJ is not, however, required to "accept without question

the credibility of such subjective evidence."  *Marcus v. Califano*, 615 F.2d 23, 27 (2d

Cir. 1979).  Rather, "[t]he ALJ has discretion to evaluate the credibility of the claimant

and to arrive at an independent judgment, in light of medical findings and other

evidence, regarding the true extent of the [subjective complaint] alleged by the

claimant."  *Marcus, supra*, at 27.

---

[14] Neither Horvath nor Sember estimated how long it was expected Plaintiff would be disabled by his condition.

Here, the ALJ specifically observed that there is no evidence in the record of Plaintiff's "explosive temper" which Plaintiff testified prevented him from working. (R. 16). The ALJ noted that despite one report in the record that Plaintiff had difficulty with a fellow rooming house resident in 1997, Plaintiff's claim was that the resident was harassing him, thereby indicating that the other resident had a problem, rather than Plaintiff. (R. 16 (citing R. 415 and 493)). Rather, the ALJ found the "real reason" Plaintiff has not worked is that Plaintiff's substance abuse caused him to lose jobs. (R.16).

The ALJ also considered that although Plaintiff alleges he cannot be around others, Plaintiff had recently taken bus trips to Connecticut, Vermont and Pennsylvania to visit with his family, and also flew to Florida to visit with his mother and step-father where he also went to Disney World and out to dinner on a daily basis. (R. 17). Plaintiff also was living in a group home with others, where he was required to perform assigned chores. (R. 17). That Plaintiff is able to take public transportation to group therapy and other locations caused the ALJ to further observe that despite Plaintiff's claims that "he cannot remember from day to day how to get from one place to another," Plaintiff's "frequent bus trips and extended travel belie such assertions." (R. 17). The ALJ further found Plaintiff, at the administrative hearing, was "deliberately vague," and changed his testimony "when questioned closely." (R. 18). In support of this finding, the ALJ gave the example wherein Plaintiff initially testified that he often called a therapist for help with suicidal thoughts, although when questioned more closely on the subject, Plaintiff admitted he had made only one such call, approximately one week before the hearing. (R. 18). These findings by the ALJ are all supported by

the record.

Accordingly, the ALJ did not err in discrediting Plaintiff's subjective claims. *Marcus, supra*, at 27.  The record thus supports the ALJ's determination that Plaintiff did not suffer from an impairment that met or equaled a listing impairment under the Act.


**E.   "Residual Functional Capacity" to Perform Past Work and Suitable Alternative Employment in the National Economy**

Plaintiff does not challenge the ALJ's decision regarding the fourth step of the inquiry, *i.e.*, whether Plaintiff can perform his past relevant work, insofar as the ALJ found Plaintiff was able to perform his past relevant work as a car detailer and insulation installer, but unable to perform his past relevant work delivering pizza given the required extensive involvement with the public.  (R. 18-19).  Nor has Plaintiff challenged the ALJ's finding, as to the fifth step of the inquiry, that Plaintiff retains the residual functional capacity to perform suitable alternative work that exists in the national economy, including work-related activities work at all exertional levels not involving more than minimal dealing with the public or following complex job instructions.  (R. 19).  As such, the court need not consider whether the balance of the ALJ's decision is supported by substantial evidence in the record.

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's motion for judgment on the pleadings (Doc. No. 7) is GRANTED; Plaintiff's cross-motion for judgment on the pleadings (Doc. No. 9) is DENIED.  The Clerk of the Court is directed to close the file.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:       November <u>4</u>, 2005
             Buffalo, New York